**Leonard WELKENER and Cinda Welkener, Plaintiffs,**

v.

**KIRKWOOD DRUG STORE CO., Defendant-Respondent, Third Party Plaintiff,**

v.

**PIONEER COMPANY, Third Party Defendant-Appellant.**

**No. 52057.**

Missouri Court of Appeals, Eastern District, Division Five.

June 30, 1987.

Motion for Rehearing and/or Transfer Denied Aug. 13, 1987.

Daniel J. Harlan, Harlan and Harlan, St. Louis, for third party defendant-appellant.

Paul S. Brown, Brown, James & Rabbitt, P.C., St. Louis, for defendant-respondent, third party plaintiff Kirkwood Drug.

Mary Elizabeth Kaslick, Witzel & Kearns, St. Louis, for plaintiffs.

SIMEONE, Senior Judge.

### I

This is an appeal by Pioneer Company (Pioneer), an Ohio corporation, from a judgment entered upon a jury verdict in favor of respondent, Kirkwood Drug Company (Kirkwood), against appellant, Pioneer, on Kirkwood's claim for indemnity. In this products liability action, plaintiffs brought suit against Kirkwood, the retailer, for injuries sustained when the plaintiff, Leonard Welkener, was injured while using a pair of crutches which collapsed. Kirkwood, the retailer, filed a third party claim

against Pioneer for "indemnity or contribution." The jury returned a verdict in favor of Leonard Welkener in the amount of $255,000 and in favor of Cinda, his wife, for loss of consortium in an amount of $10,000, and found in favor of Kirkwood Drug Company against Pioneer for the same amounts on Kirkwood's claim of "indemnity." The court entered judgment in favor of Kirkwood against Pioneer for $265,000.00. Pioneer appeals contending (1) that the court did not have *in personam* jurisdiction over it because it did not have sufficient minimum contacts with the state of Missouri; (2) the trial court erred (a) in giving certain instructions which authorized Kirkwood (retailer) to recover full indemnity from Pioneer (manufacturer) and (b) refusing certain tendered instructions which would have allowed contribution or apportionment of fault between Kirkwood and Pioneer and (3) the trial court erred in refusing to permit a witness for Pioneer to testify that no other accidents had been reported to the company, since such testimony was relevant on the issue of design. For reasons hereinafter stated, we affirm.

II

These proceedings began when Leonard Welkener and his wife, Cinda, filed their third amended petition in the circuit court of the City of St. Louis against Kirkwood and Pioneer, among others, seeking to recover damages for injuries sustained by Leonard when one of the crutches which he had rented from Kirkwood Drug collapsed and the handle thereof "disengaged." The theory of the petition was based upon strict products liability. The petition alleged *inter alia* that the crutch which collapsed was defective and dangerous; that the handle of the crutch was "designed in such a manner as to allow it to become dislodged from the crutch assembly while being used," and that the handle was manufactured without proper safety devices to prevent the handle from being disengaged from the crutch assembly. The petition further alleged that Pioneer manufactured, distributed and sold crutches in Missouri for the use of Missouri consumers; that they were "designed, manufactured and placed into the channels of commerce," and that the crutch was defective and dangerous. Plaintiffs did not make any allegation concerning Kirkwood's duty or failure to inspect the crutch before it was rented to Leonard Welkener.

Prior to trial, Kirkwood filed its third-party petition against Pioneer alleging that it is an Ohio corporation subject to jurisdiction pursuant to § 351.633, R.S.Mo.1978; that Pioneer manufactured the crutches; that Pioneer distributed the crutches into the stream of the "national channels of commerce" through the use of distributors, and that if Kirkwood were held liable to plaintiffs, it have judgment in a "like amount" against Pioneer or "in the alternative" that the court and jury determine the proportionate fault between Kirkwood and Pioneer and assess damages accordingly. Service of summons was made upon the Secretary of State pursuant to § 351.633, R.S.Mo.1978. Pioneer opposed the third party petition on the ground that the court had no jurisdiction over it. This motion was overruled and Pioneer was ordered to answer. In proper time, Pioneer appeared "specially" and answered the third party petition, again asserting lack of jurisdiction.

On April 7, 1986 the trial began. The jury could reasonably find the following.

Leonard E.C. Welkener, a 39–year old man, weighing about 265 pounds was injured on September 8, 1981 when in the course of his job, he attempted to unload a bag of flour from a tractor-trailer in Illinois. He fell on his leg and injured his left knee. Early the next morning, Cinda took him to St. Joseph's Hospital in Kirkwood, Missouri. The hospital personnel placed an "ace bandage" on the knee and advised him to contact an orthopedic group and "rent a set of crutches." When they left the hospital, the Welkeners went to the Kirkwood Drug Store and asked to rent a set of crutches. The saleslady, Jackie Morris, brought out a set of crutches and attempted to fit them to his height. As she was doing so, Leonard "glanced" down and noticed that one of the wing nuts "supporting the lower main support" was missing. The

saleslady took the crutches back and returned with a pair of crutches (perhaps the same pair) complete with "wing nuts." The saleslady adjusted the height by placing the handle in the lowest position and placed them under Leonard's arms. Leonard rented the crutches, paid the saleslady and received a receipt.

Eventually Leonard went to the St. Louis County Orthopedic Group, and his knee was treated by physicians by placing the leg in a "straight leg brace." On October 2, 1981 Leonard had surgery on his knee at St. Anthony's Hospital—"they reconstructed my left knee"—and about a week later he was released and returned home to convalesce.

Leonard's leg was in a "full leg cast." He used the crutches to walk around the house. The Welkener house had a living room, kitchen, bath and the daughter's bedroom on the first floor and the Welkener's bedroom was in the "basement." A stairwell proceeded to the basement bedroom. Leonard negotiated the steps on crutches at a minimum of "twice a day." About midnight, October 17, 1981, Leonard began to traverse the stairwell. When he "got" to the opening of the stairway, he placed the crutches on the "first step below the level of the kitchen floor, ... eased his weight forward to let the crutches accept my body weight, ... brought my good leg forward and brought it down to the level of where the ends of the crutch were on the first step." When he reached the second step the "left crutch fell apart." The handle came off; it was in his hand and he "fell down the flight of steps." He had broken his wrist—"the bones was [sic] sticking out at the wrist and I was bleeding." His forearm was also injured. He called his wife; the paramedics arrived and took him to St. Joseph's Hospital. He incurred substantial medical expenses, spent several weeks in two hospitals, took physical therapy treatments, suffered a "frozen shoulder syndrome" and suffered lost wages in a substantial amount.

The crutches involved in this proceeding were manufactured, designed, and distributed by Pioneer. They were made about "twenty years ago, about 1965." Pioneer is a corporation organized and existing in the State of Ohio with its factory and headquarters in Lisbon, Ohio. The crutches are marked as being manufactured by Pioneer. The Company manufactures and distributes medical equipment. The president of Pioneer, Mr. Tuseck, testified that Pioneer has been in the business of manufacturing aluminum crutches with wood tops and handles for twenty-five years. He testified that the company had no dealer or representative in Missouri, nor could he find any record that the company ever did business with Kirkwood. He had no knowledge of how the crutches came into Kirkwood's possession. Pioneer, however, sends out almost 15,000–20,000 catalogues each year to advertise its products throughout the country, including Missouri. Catalogues are sent to every state and Pioneer makes no attempt to limit the sales of its crutches to any particular state. But it has no dealer or supplier in Missouri. An affidavit of one Jack Dunning made during pre-trial, stated that he owned a pharmacy in Farmington and had received brochures from Pioneer advertising their products. In the 1970's he "ordered" some walkers which Pioneer delivered. His dealings were directly with Pioneer "through their brochure and by direct mail." Tuseck's counter-affidavit stated that the company has no record of ever having done business with Kirkwood Drugs or with anyone else in Missouri except Jack Dunning in 1976. The catalogues are sent to surgical supply houses, wholesale druggists and druggists. Mr. Tuseck testified that he expected that and it would not be unusual that their products would be retailed to a drug store from a supply house. Jack Richard Bishop testified that Kirkwood purchased Pioneer crutches indirectly from Professional Convalescent Products located in Cincinnati, and had never done business with Mr. Tuseck of Pioneer.

Miss Peggy Greco of Des Peres, Missouri, testified that in October 1985, she bought a pair of crutches with a plastic, rather than wooden, top from Pioneer by ordering them by telephone.

Mr. Tuseck, who is "most familiar with the testing procedures performed on their crutches, described the design and manufacture of the crutches in question. Pioneer manufactures its crutches for the general population without regard to the height or size of the person using them, but it would expect a 265 pound person to use them. The crutches are made mostly of aluminum. The top of the crutch which fits under the person's arm is wooden; there is an adjustable wood handle with a steel pin or rod which fits into an adjustable square hole on the inside of each leg, and the adjustable legs are aluminum. Each crutch has an adjustable extension, or crutch leg, made of aluminum, with pierced holes. The leg is held in place by two bolts secured by wing nuts. When the wing nuts are removed the leg can be adjusted to the proper height, the two sides of the crutch "spread apart" so as to move the handgrip to an adjustable proper position. No brochure is sent out with the crutches giving directions on how to adjust the handles. One of the crutches that Leonard rented had a "broken" or "cracked" "wooden top." There were "gouges," or "deep scratches" on the bottom leg of one crutch.

Mr. Bishop, an employee of Kirkwood testified that the crutches were rented by Leonard; that when crutches were rented the employees would not necessarily make any inspection of the condition of the handles, but would inspect the location of the handles so that they would be equidistant. He could not say that there was a crack in the wooden portion of the crutch when the crutches were rented to Leonard. During Mr. Bishop's testimony, the attorney for plaintiff sought to introduce evidence that Kirkwood negligently failed to inspect the crutches. But since the pleadings pleaded only a "defective product" and that Kirkwood sold a "defective product," the court sustained Kirkwood's objections.

The court stated:

Your [attorney for plaintiffs] question could seem ... to establish ... he [Kirkwood] was negligent in representing the crutches at that time and I don't recall any such allegation in your pleading.

Professor Virgil J. Flanigan, a mechanical engineer, testified as an expert witness for the plaintiffs. In his opinion, the Pioneer crutch was defectively designed due to the fact that the "handle was not an integral part of the assembly," and because the "design is to slip the handle into those punched holes ... because they are not rigidly secure to the side members of the crutch." The defect could be cured by a "simple bolt with a wing nut." He also indicated that the defective design consisted of the fact that the "square prongs are not equally spaced in the handles so the handle would come out easier...."

In the defendant's case in chief and during the testimony of Mr. Tuseck, he was asked how many crutches were manufactured and distributed during 18–20 years. He replied, "tens of thousands" or "twelve thousand" a year. Counsel for Pioneer sought to introduce testimony that throughout all the years that Tuseck had no knowledge of any prior accidents involving the same make and model as the rented crutches. Prior to trial plaintiffs filed a motion in limine to prohibit the defendants from attempting to introduce "evidence or make reference to fact, comment on, imply or otherwise leave the jury with the impression that the absence of any complaint" should be admitted. The motion was sustained and at trial, when Mr. Tuseck sought to so testify, the ruling "remained the same." [1]

During the instruction conference, counsel for Pioneer sought to amend the pleadings to show Kirkwood committed specific acts of fault before it rented the crutches to Leonard. During the conference, counsel for Kirkwood "handed" the court an instruction for judgment "over against" Pioneer if the verdict is in favor of plaintiffs and against Kirkwood.

Counsel for Kirkwood informed the court that the evidence "makes a submissible

---

**1.** Counsel sought to admit such testimony on the authority of *Sturm v. Clark Equipment Co.,*

547 F.Supp. 144 (W.D.Mo.1982).

jury issue against ... Kirkwood ... by plaintiff, that the product was defective when rented" and as defectively designed "was defective and unreasonably dangerous when put to a reasonable anticipated use." Counsel for Kirkwood then stated that "there are no allegations of any negligence or any conduct against [Kirkwood] other than selling a defectively designed crutch." Counsel contended that "under the law it [Kirkwood] has no duty to make an engineering or design inspection" and that there was "nothing in the evidence that would in any way implicate [Kirkwood]" other than "[it] furnished a defective crutch ... [or] that Kirkwood had any knowledge of any alleged design manufacture defects ... [so that] under the [law] [2] [Kirkwood] is entitled to indemnity over against the manufacturer." Counsel for Pioneer contended that Kirkwood apparently had the defective crutch in its possession for a long period of time and had rented it out before and that a defect was "easily visible upon inspection." The court ruled that it previously had made it clear that there was nothing in the pleadings to show specific acts of fault on the part of Kirkwood and any attempt by Pioneer to amend the "pleadings as to specific acts" came too late. Counsel for Pioneer contended that "it was entitled to an instruction that the ... crutch as originally sold was in good condition ... [but] had passed through [many hands] on a number of occasions, ... and that [Kirkwood's] negligence in failure to inspect ... when the defect was obvious" entitled it to amend its answer and seek contribution in accordance with *Lippard v. Houdaille.*[3] The motion to amend the answer was overruled.

The court then gave certain instructions. Instruction No. 7, based upon MAI 3rd 25.04 (1981), informed the jury that its verdict must be for Leonard Welkener if it believed (1) Kirkwood rented the crutch in the course of its business, (2) the crutch was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, (3) it was used in a manner reasonably anticipated, and (4) plaintiff was injured. Instruction No. 11, the verdict director for Cinda was identical. Instruction Nos. 15 and 17 informed the jury that if it found in favor of Leonard and Cinda, then the verdict must also be for Kirkwood and against Pioneer "for the same amount" if it believed (1) Pioneer manufactured and placed in the channels of commerce the rented crutch, (2) the crutch when manufactured and placed in the channels of commerce was then in a defective condition, (3) the crutch was used in a manner reasonably anticipated, and (4) plaintiffs were damaged.

Pioneer tendered certain instructions which were refused. The thrust of these instructions, C, D, E, F, G and H were that Pioneer was entitled to submit the issue of apportionment of fault on the part of Kirkwood. Tendered Instruction D would have told the jury that it must assess a percentage of fault to Kirkwood if it believed that Kirkwood "failed to inspect" the crutch and that it was thereby negligent, which negligence directly caused damage or "combined" with the defective condition when the crutch was originally sold to cause damages to Leonard. The instruction also directed the jury that if the verdict were in favor of Leonard and against Kirkwood, then the verdict must also be in favor of Kirkwood if the defective condition existing when the crutch was originally sold by Pioneer caused, or combined with the acts of Kirkwood to cause, damages to Leonard.

The jury returned a verdict in favor of Leonard for $255,000, in favor of Cinda in the amount of $10,000 and in favor of Kirkwood against Pioneer. Judgment was

---

**2.** Kirkwood relied on *Hales v. Green Colonial, Inc.,* 402 F.Supp. 738 (W.D.Mo.1975); aff'd in part 544 F.2d 331 (8th Cir.1976); *Sisco v. Nu Process Brake Engineers, Inc.,* 462 S.W.2d 658 (Mo.1971).

**3.** The reference is to the opinion handed down by this court which held that the doctrine of comparative fault applied to strict liability. Our opinion was not accepted by the Supreme Court which held that the doctrine is not applicable in strict liability cases. *Lippard v. Houdaille Industries, Inc.,* 715 S.W.2d 491 (Mo. banc 1986). This court's opinions are attached as an appendix to the dissent by Welliver, J.

entered thereon in favor of plaintiffs against Kirkwood in a total amount of $265,000 and the court, in turn, entered judgment in favor of Kirkwood against Pioneer in the same amount.

This appeal followed.

On appeal, Pioneer contends (failing to follow the mandate of Rule 84.04) that the trial court erred in (1) overruling its contention that the Missouri courts lack personal jurisdiction over it because Pioneer did not "commit a tort" in Missouri and because Pioneer did not have sufficient minimum contacts with Missouri to subject it to jurisdiction *in personam,* (2) in giving verdict instructions Nos. 15 and 17 on strict products liability and in refusing the tendered instructions dealing with apportionment of fault, and (3) refusing to permit Mr. Tuseck, the president of Pioneer, to testify that over the past eighteen to twenty years no other accidents or mishaps had occurred involving the model of crutch in question.

### III

The three legal issues, (1) jurisdiction *in personam,* (2) the availability of the doctrine of apportionment of fault in strict products liability and (3) the relevancy of evidence of lack of other accidents, raised in this appeal are rather novel, and the issue dealing with whether the doctrine of apportionment of fault, as distinguished from comparative fault, is one of first impression and not easily resolved. The specific issue must be resolved in the context in which it was presented to the trial court and its procedural posture on appeal.

■ As to Pioneer's first point that the court did not have jurisdiction *in personam,* we conclude there was jurisdiction and that there were sufficient minimum contacts by Pioneer so as to authorize the exercise of jurisdiction *in personam.*

There is no need to detail the lengthy history of jurisdiction *in personam* from its starting point in *International Shoe v. State of Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed.2d 95 (1945) through *Asahi Metal Ind. v. Super. Ct. of Cal., Solavo Cty,* —— U.S. ——, 107 S.Ct. 1026,

94 L.Ed.2d 92 (1987), and the numerous Missouri decisions. We recently did that in the excellent opinions of *State ex rel. Wichita Falls General Hospital v. Adolf,* 728 S.W.2d 604 (E.D.Mo.1987) and *State ex rel. Pain, Anesthesia and Critical Care Services, P.A. v. Ryan,* 728 S.W.2d 598 (E.D.Mo.1987); *see also Crouch v. Crouch,* 641 S.W.2d 86, 89 (Mo. banc 1982). Suffice it to say that in products liability cases, courts, including the Supreme Court of the United States, have taken the position that if the sale or distribution of a product of a manufacturer arises from the efforts of the manufacturer to serve the market for the product in other states, it is not unconstitutional or unreasonable to subject the manufacturer to an action in one of those states if the product is the cause of an injury. The manufacturer purposely avails itself of the privilege of conducting activities in the forum, so that it is not unreasonable that the manufacturer be haled into court at the place of the injury. If the manufacturer markets and delivers its product into the stream of commerce with the expectation that the products will be sold in the forum, it is not a violation of due process of law to require the manufacturer to defend in the forum state. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490, 501 (1980). "The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." 444 U.S. at 297–98, 100 S.Ct. at 567, 62 L.Ed.2d at 502, *see* 63 Am.Jur.2d, *Products Liability,* § 892 at 1281–1282. Appellant relies upon *World-Wide Volkswagen* as authority for the proposition that it is not subject to jurisdiction. *World-Wide* is not controlling. There the act was a mere fortuituous one where the manufacturer had no "contacts, ties or relations" with the forum, and involved a unilateral act of a consumer, not the manufacturer.

Here, Pioneer not only manufactured the crutches in Ohio, but solicited purchases by sending out thousands of brochures and

catalogues of its products throughout the United States, including Missouri.

In *State ex inf. Danforth v. Reader's Digest*, 527 S.W.2d 355 (Mo. banc 1975), the Supreme Court held a corporation which mailed or caused to be mailed into Missouri solicitations for magazine subscriptions and purchase orders for numerous items subjected the company to jurisdiction. The "promotional activity" engaged in to sell items of merchandise was sufficient to subject the non-resident corporation to jurisdiction. *Osage Homestead, Inc. v. Sutphin*, 657 S.W.2d 346 (Mo.App.1983), which Pioneer relies upon is clearly distinguishable; in that case the contact with Missouri was an advertisement in a water well journal.

The regular circulation of magazines in a forum state is sufficient to support an exercise of jurisdiction. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). Also a foreign manufacturer's regular solicitation of orders is sufficient to sustain jurisdiction. *Marshall Const. Co. v. M. Berger Co.*, 533 F.Supp. 793 (W.D.Ark.1982); annot., 27 ALR 3d 397 (1969); 24 ALR 3d 532 (1969); *cf. Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.E.2d 761 (1961); Hursh & Bailey, *Amer. Law Prod. Liab.* 2d *supra*, § 16:3 (1975); *State ex rel. Apco Oil Corporation v. Turpin*, 490 S.W.2d 400 (Mo.App.1973)—foreign corporation which manufactures product for use in Missouri is subject to jurisdiction; *State ex rel. Metal Serv. Center v. Gaertner*, 677 S.W.2d 325 (Mo. banc 1984).

Appellant's first point is denied.

### IV

As to appellants' second point, we hold that the principle of relative fault is applicable to strict products liability cases, but because appellant did not plead or prove such fault, the trial court did not err.

In recent years, Missouri tort law and its procedural satellites have undergone tremendous change. Beginning with the decision of *Missouri Pac. R. Co. v. Whitehead & Kales Co.*, 566 S.W.2d 466 (Mo. banc 1978), through *Gustafson v. Benda*, 661 S.W.2d 11 (Mo. banc 1983) to *Lippard v. Houdaille Industries, Inc.*, 715 S.W.2d 491 (Mo. banc 1986), the law has changed to provide a fairer system in Missouri tort law and an amelioration of the harshness of the common law. These decisions, especially *Whitehead & Kales* are based upon the fundamental "principle of fairness." *Whitehead & Kales, supra*, 566 S.W.2d at 468–69. Under these and other Supreme Court decisions, Missouri has (1) adopted the doctrine of comparative fault; (2) adopted the doctrine of "relative" fault [4] or "apportionment" of fault; (3) changed the common law and the former statutory rules relating to "contribution" among joint tortfeasors; and (4) held that the principles of comparative fault are not applicable to strict products liability cases. In *Lippard, supra*, the court adopted the principle that, although a plaintiff may sue and recover from one or more joint tortfeasors, one such tortfeasor may be responsible for his proportionate fault.

Most of these "new" concepts are in accord with the various Uniform Laws adopted by the Commissioners on Uniform State Laws. *Uniform Comparative Fault Act*, 12 ULA, 1987 Cum. Annual Pocket Part at 37 *et seq.* (1987); *Uniform Contribution Among Tortfeasors Act*, 12 ULA 57 *et seq.* (1975).

One of the questions still unsettled is whether the new principles of relative fault or apportionment of fault are applicable to strict products liability cases originally authorized by *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362 (Mo. 1969). There are certain analogous principles and decisions.

■ The Missouri courts have adopted the doctrine of strict liability in tort as set forth in the Restatement (Second) of Torts, § 402A (1965). One who "sells" a "product" in a defective condition, unreasonably

---

4. *See,* for a development of the doctrine, annot., 53 ALR 3d 184 (1973); *Skinner v. Reed-Prentice Division, Etc.*, 70 Ill.2d 1, 15 Ill.Dec. 829, 374 N.E.2d 437, *cert. den.*, 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed.2d 787 (1978); Note, 44 Mo.L.Rev. 691 (1979); Note, 49 Mo.L.Rev. 121 (1984); Note, 46 Mo.L.Rev. 886 (1981).

dangerous to the user or consumer is subject to liability for injury caused by the defect. To prevail under this doctrine of strict liability, a plaintiff must prove that the product was defective and dangerous when put to a reasonably anticipated use, and that the plaintiff sustained damages as a direct result of the defect. *Blevins v. Cushman Motors*, 551 S.W.2d 602, 607 (Mo. banc 1977); *Klein v. General Elec. Company*, 714 S.W.2d 896 (Mo.App.1986). The whole purpose of "products liability law, essentially, is to socialize the losses caused by defective products." *Lippard, supra*, 715 S.W.2d at 492. Negligence is not an element of a products liability case. Although the Supreme Court concluded in *Lippard* that there should be no change in the Missouri common law rule, as established in the *Keener* opinion, and that the plaintiff's contributory negligence is not at issue in a products liability case the Court recognized that the conclusions "here expressed have nothing to do with the sharing of liability by defendants under principles first enunciated in *Missouri Pacific Railroad Company v. Whitehead & Kales Company*, 566 S.W.2d 466 (Mo. banc 1978)." *Lippard, supra*, 715 S.W.2d at 493–94.

■ Under the modern doctrine of strict products liability, and the Restatement (Second), any person who is "engaged in the business of selling products for use or consumption" is subject to liability. The rule stated in the Restatement applies to "any manufacturer of such a product, [and] to any wholesale or retail dealer or distributor ..." *Restatement (Second) of Torts, supra*, comment f, at 350. Parties in the chain of distribution of a product, including manufacturers, sellers, wholesale distributors or other middlemen in the manufacturing and selling process come within the umbrella of the rule. 1 *Amer. Law Prod. Liab.* 3d §§ 5.4, at 13, 5.5, at 15, 5.6, at 16–17 (1987); 2A L. Frumer and M. Friedman, *Products Liability*, § 6.18 at 6–252 *et seq.; Vandermark v. Ford Motor Co.*, 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964); *Kopp v. C.C. Caldwell Optical Co.*, 547 S.W.2d 872 (Mo.App.1977); *Means v. Sears Roebuck & Co.*, 550 S.W.2d 780 (Mo.

banc 1977); 63 Am.Jur.2d, *Products Liability*, § 572 at 816 (1984) citing numerous decisions.

Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products. In some cases, the retailer may be the only member of that enterprise reasonably available to the injured plaintiff.... 391 P.2d at 171, 172.

The retail druggist as well as other retailers come within the rule. *See* 63 Am. Jur.2d, *Products Liability*, § 721 at 1019 (1984).

■ Generally, the seller-retailer who neither knows nor has reason to know that a product manufactured by another is defective has no duty to test or inspect the product, and his failure to inspect will ordinarily not render him liable for injuries caused by the product. *Willey v. Fyrogas Co.*, 363 Mo. 406, 251 S.W.2d 635 (1952); cases collected in annot. 6 A.L.R.3d 12, 22 (1966); 63 Am.Jur.2d, *supra*, § 313 at 370; 1 *Amer. Law Prod. Liab., supra* 3d, § 11.21 at 30–31, 3A Frumer & Friedman, *supra*, § 44.02[3][b] at 15–30; 2A Frumer & Friedman, *supra*, § 60.3(a) at 6–19. But if the defect is such that a reasonably prudent seller should have discovered it before selling the product and delivering it to the consumer, the seller may be held liable for injuries caused by a defect. *Schwartz v. Macrose Lumber & Trim Co.*, 50 Misc.2d 547, 270 N.Y.S.2d 875, 888 (1966); annot., 6 ALR 3d at § 7; 1 *Amer. Law Prod. Liab., supra*, § 11:21 at 31.

Whether a "seller" in the chain of distribution may have indemnity or contribution against one higher in the chain such as the supplier or manufacturer or vice versa is an heretofore unsettled question in this state. In *State ex rel. General Elec. Co. v. Gaertner*, 666 S.W.2d 764 (Mo. banc 1984) it was held that a defendant, which sold light fixtures to another whose property was damaged, could implead a third party which had designed and manufactured a

defective component of the light fixture. The Supreme Court held that the defendant could seek to obtain relative apportionment of damages by means of third party practice at any time during the pendency of the original plaintiff's timely action even though the statute of limitations had run on the third-party claim. The Court held that a claim asserted by a third-party plaintiff, whether based on contribution, indemnity or some other theory of recovery is "separate and distinct from the tort claim asserted by the plaintiff against the defendant." 666 S.W.2d at 766.

In his concurring opinion, then Chief Justice Rendlen stated that "[d]efendant tells us that its claim is one for contribution under the doctrine elucidated in *Missouri Pacific Railroad Co. v. Whitehead & Kales*, ... but *Whitehead & Kales* involved a claim and attempted interpleader predicated on negligence." 666 S.W.2d at 768. The Chief Justice then went on to say:

> Apparently no Missouri court has ever determined that the seller of a defective product held strictly liable in tort has a claim for (partial) contribution predicated on strict liability against his supplier. Authorities suggest that if such claim exists, it is one for (full) indemnity not (partial) contribution. *See* Unif. Comparative Fault Act § 2 Commissioner's Comment and *Hales v. Green Colonial, Inc.*, 402 F.Supp. 738 (W.D.Mo.1975) (Missouri courts would hold that seller held strictly liable in tort has cause of action for indemnity against manufacturer of product found to be unreasonably dangerous where seller had no actual knowledge of defect). 666 S.W.2d at 768.

In *Hales, supra*, the United States District Court held that where the distributor and supplier of a heating unit who had no knowledge of defects and who were held strictly liable for selling a defective product were entitled to indemnity against the manufacturer. The District Court stated that in strict liability cases under § 402A of the Restatement, other courts have recognized the right of persons down the distributive chain to shift the loss back to the manufacturer. "We find and conclude that the weight of authority generally supports a cause of action for indemnity against the manufacturer of a defective product which has been found to be unreasonably dangerous where the seller seeking indemnity has no knowledge of the defect." 402 F.Supp. at 741. *Cf. Sisco v. Nu Process Brake Engineers, Inc.*, 462 S.W.2d 658 (Mo.1971) —relied upon in *Hales, Walasavage v. Marinelli*, 334 Pa.Super. 396, 483 A.2d 509, 518 (1984)—"The law places final responsibility in such instances upon the party primarily responsible for the defective product, in most instances its manufacturer." *Id.* at 518. This is the general principle. *See* 3A Frumer & Friedman, *supra*, § 44.02[3][b] at 15–31; cases collected in 63 Am.Jur.2d, *supra*, § 889, fn. 7 at 1276; *Fairburn v. Montgomery Ward & Co., Inc.*, 349 So.2d 1280 (La.App.1977).

■ We agree with the authorities which hold that a "seller" lower in the chain of distribution who sells a product without actual or constructive knowledge of a defect and who has no duty to inspect is entitled to indemnity against one higher in the chain, such as the manufacturer.

Whether there may be indemnity or contribution between a "seller" and a "user," [5] when the defective product causes injury to another has been the subject of conflicting authorities. Much depends on the particular facts and circumstances. Some decisions have held that under the particular facts, the "user" is entitled to contribution or indemnity from the manufacturer on the theory of the manufacturer's strict liability. *Newmark v. Gimbel's, Inc.*, 54 N.J. 585, 258 A.2d 697 (1969)—beauty parlor (user) found strictly liable to customer who has claim against manufacturer of hair treatment solution; *Hunt v. City Stores, Inc.*, 387 So.2d 585 (La.1980). A manufacturer has been held to be entitled to indemnity or contribution against the user. *Montesano v. Patent Scaffolding Co.*, 213 F.Supp. 141 (W.D.Pa.1962)—both manufacturer and user at fault. *See* decisions collected in 63 Am.Jur.2d, *supra*, § 887 at 1268–72; an-

---

**5.** An ultimate consumer or the person for whose use the product was made or sold.

not., 28 A.L.R.3d 943 (1969); 3 R. Hirsch & H. Bailey, *supra*, § 18:7 at 95.

A manufacturer sued under strict products liability may join a third party non-seller, whose negligence is a factor in causing plaintiff's injury. In *Kohler v. Rockwell Intern. Corp.*, 600 S.W.2d 647 (Mo.App. 1980), plaintiff, a ten-year old, was injured on a wagon unloader. He sued the manufacturer, based on defective design. The manufacturer sought to implead plaintiff's brother, alleging the brother was negligent in failing to stop the machine when the plaintiff approached it. The court allowed the impleader, holding that since intra-family immunity does not exist in Missouri, the manufacturer could seek contribution based on the relative fault of the brother. The negligence of a seller is comparable to that of a third party, such as the brother in *Kohler.*

This case involves the doctrine of relative fault as it applies to whether the manufacturer may be entitled to contribution against the retailer—that is whether one higher in the chain of commerce may have contribution against one lower in the chain. Most of the decisions deal with whether the retailer may have indemnity or contribution against the manufacturer—i.e., one lower in the chain against one higher. In the latter situation, in the absence of any duty to inspect or in the absence of knowledge, indemnity is proper.

■ Although *Hales, supra* holds and Judge Rendlen's concurring opinion in *General Electric v. Gaertner, supra* suggests that there is a right of indemnity by a "seller" against another in the chain of distribution when the "seller" *has no actual knowledge of a defective condition in the product,* we believe that the judicial decisions, authorities and scholarly commentaries indicate that where the "seller" —one lower in the chain of distribution such as a retailer—has actual or constructive knowledge of a defect in the product sold, it is subject to contribution to another "seller" higher in the chain of distribution, such as a manufacturer. This principle of "relative fault" among the various "sellers" in the chain of product distribution is

consistent with the principle of fairness established in *Whitehead & Kales* and was explicitly recognized by our Supreme Court in *Lippard v. Houdaille*, supra, S.W.2d at 493–494. The conclusions reached in *Lippard* have "nothing to do" with the sharing of liability by defendants under the principles of *Whitehead & Kales.* Our holding is also consistent with the language and philosophy of earlier Missouri decisions, the Uniform Comparative Fault Act, and cases in other states. *See Sisco v. Nu Process Brake Engineers, Inc., supra,* 462 S.W.2d at 660–61—installer allowed indemnification against manufacturer for indemnity; *Hughes Provision Co. v. La Mear Poultry & Egg Co.,* 242 S.W.2d 285 (Mo.App.1951); *Woods v. Juvenile Shoe Corp. v. America,* 361 S.W.2d 694 (Mo.1962); 3A Frumer & Friedman, *supra,* § 44.02[3][b] at 15–30, 15–31; *Howell v. Bennett Buick, Inc.,* 52 A.D.2d 590, 382 N.Y.S.2d 338 (1976); 63 Am.Jur.2d, *supra,* § 889 at 1277; *Duckworth v. Ford Motor Co.,* 320 F.2d 130 (3d Cir.1963); annot., 97 ALR 2d 811 (1964); Uniform Comparative Fault Act, § 2.

Whether in strict products liability cases full indemnity or partial contribution is allowed depends upon the facts and circumstances of the particular case, the character of the parties in the chain of distribution, and the knowledge, actual or constructive, of the person alleged to be at fault. Under the philosophy of the Missouri decisions, we state only that the doctrines of indemnity and contribution are applicable in strict products liability cases. The principle is within the parameters of *Gustafson, Lippard,* and *Whitehead & Kales.*

■ However, to be entitled to utilize these principles, they must, as in other cases, be pleaded and proved by proper allegations and substantial evidence. In the absence of such pleading and proof, they may not be utilized. In the case at bar, Pioneer did not plead in its answer to Kirkwood's third-party petition any "fault" on the part of Kirkwood before it rented the crutches to Leonard; it did not allege any duty on the part of Kirkwood to inspect the crutches rented; there was a complete absence of allegations, and insuf-

ficient proof to show that Kirkwood had a duty to inspect the crutches before renting them. The whole theory of plaintiff's case, Kirkwood's third-party claim and Pioneer's case was based on the theory of strict liability—solely on furnishing a defective product. Nothing in the pleadings of the plaintiffs or Pioneer's answer alleged relative fault on the part of Kirkwood. It was only after the evidence was closed and at the instruction conference that Pioneer sought to amend its pleadings to plead in accordance with this Court's opinion in *Lippard*.[6] Under such circumstances we cannot say that the trial court committed error. Pioneer did not plead a duty on the part of Kirkwood to inspect, nor did it plead that Kirkwood had knowledge, actual or constructive, that the crutches were in a defective condition. In the absence of such express pleading and substantial evidence, the trial court did not err in giving instructions Nos. 15 and 17 and refusing to give Pioneer's tendered instructions. As counsel for Kirkwood stated in the instruction conference, there was nothing in the pleadings or evidence that would implicate Kirkwood or show that Kirkwood had any knowledge of any design defect other than it "furnished a defective product" so that Kirkwood "is entitled to indemnity over against the manufacturer."

Under such circumstances the trial court did not err. This point must be denied.

## V

■ The last point relied upon by Pioneer is that the court judicially erred in sustaining plaintiffs' motion in limine to suppress testimony of Mr. Tuseck of Pioneer to the effect that he had no knowldge of any prior accidents involving crutches over the past years, and in ruling the same way during trial. The court is, of necessity, given broad discretion to determine

whether to admit or exclude evidence. That discretion will not be disturbed on appeal unless there has been a manifest abuse. *Nielson v. Dierking*, 418 S.W.2d 146, 151 (Mo.1967). Pioneer relies upon *Siebern v. Missouri-Illinois Tractor & Equip.*, 711 S.W.2d 935 (Mo.App.1986). In *Siebern*, this court held that under the circumstances, testimony of the defendant's expert that equipment giving rise to a wrongful death claim had never been involved in any "rollovers" was admissible. This Court stated, however, in a products case there is no absolute rule as to the admissibility of such evidence and that the "usual rule is that evidence of non-occurrence of prior accidents is not admissible." Such evidence does not necessarily prove lack of negligence. It proves only absence of other injuries. Such evidence raises collateral issues which have a tendency to confuse the jury. In *Siebern*, we upheld the trial court's action in admitting the evidence under the circumstances. While it has been held, as a matter of federal law, that evidence of the absence of prior accidents is admissible in a products liability case, *Sturm v. Clark Equipment Co.*, 547 F.Supp. 144 (W.D.Mo.1982), the usual rule is that evidence of non-occurrence of prior accidents is not admissible. *Siebern, supra*, 711 S.W.2d at 940. McCormick, *Evidence*, § 200 at 590 (3d ed. 1984) states that the "general rule" is that proof of absence of other accidents is not admissible. Annot., 31 ALR 2d 190 (1953). However, some decisions recognize that lack of other accidents may be admissible to show such matters as absence of a defect. McCormick, *supra*, at 591; *Riney v. Zenith Radio Corp.*, 668 S.W.2d 610, 611 (Mo.App. 1984)—no knowledge of other fires reported admissible in the discretion of court. There is no absolute rule. Much must be

**6.** The court denied an oral motion to amend the answer to Kirkwood's third party petition to plead specific acts of negligence on the part of Kirkwood because it came "too late." The court did sustain a motion to amend the answer to conform to this court's opinion in *Lippard,* and Pioneer filed a memorandum merely stating that the answer is amended to conform to *Lippard* so as to plead comparative fault against

Kirkwood. Nothing further was filed and no specific acts of negligence were ever alleged against Kirkwood.

The motion to amend in accord with *Lippard* was sustained by the court in order to submit "all the issues" to the jury. The case was "tried" on the theory of product liability due to defective design. The jury resolved the issue.

left to the sound discretion of the trial court. Even if the testimony should have been admitted, there was no prejudicial error. Rule 84.13(b). We find no prejudicial error in refusing to admit such testimony of Mr. Tuseck as to the non-occurrence of any other accidents.

### VI

We have read the entire record, the briefs of the parties and the authorities relied upon. We find no prejudicial error. The judgment is affirmed.

SNYDER, C.J., and CARL R. GAERTNER, J., concur.